**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| FLORIDA RIGHT TO PRAY TOGETHER, JOHN LOUDON, CITIZENS IN CHARGE & TRENTON DONN POOL | : : : | |
| | : | CIVIL ACTION 4:22-cv-00033 |
| Plaintiffs, | : | Judge Robert L. Hinkle |
| | : | |
| vs. | : | PLAINTIFFS' MEMORANDUM |
| | : | OF LAW IN OPPOSITION TO |
| LAUREL LEE, in her official capacity as | : | DEFENDANT MOODY'S |
| FLORIDA SECRETARY OF STATE, and | : | MOTION TO DISMISS |
| ASHLEY MOODY, in her official capacity | : | |
| as FLORIDA ATTORNEY GENERAL | : | |
| | : | ***FILED ELECTRONICALLY*** |
| Defendants. | : | |

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT MOODY'S MOTION TO DISMISS</u>**

**I.   <u>INTRODUCTION & FACTS</u>**

In the summer of 2019, the Florida legislature passed, and Governor

DeSantis signed into law, a suite of new restrictions imposed only on sponsors and

circulators of initiative petitions seeking to amend the Florida state constitution.

Based on legislative testimony, the restrictions were passed specifically to make it

more difficult for sponsors of proposed amendments to the state constitution to

secure ballot access.  Unfortunately, their plan has succeeded with spectacular

effect.  No initiative petition seeking to amend the Florida state constitution has

secured access to Florida's general election ballot under the 2019 ballot access

restrictions.  Plaintiffs invite the Court to take note that state legislators, who want to be able to collect signatures for their own nomination petitions, refused to apply the same restriction to the circulation of their own ballot access petitions.  It is obvious that the new rules are specifically designed to inhibit the ability of voters to connect with initiative petition circulators to advance an agenda outside the control of state legislative leaders.

Plaintiffs, who are current and intended future sponsors of initiative petitions seeking to amend the Florida state constitution and a professional petition circulator who refuses to work under the new ballot access restrictions, clearly and unambiguously challenge the 2019 ballot access restrictions under the First and Fourteenth Amendments.

Plaintiffs challenge the ban on compensating initiative petition circulators (and only initiative petition circulators) based on the number of signatures collected (even valid signatures) imposed by Fla. Stat. Title IX §104.186 (2021) (hereinafter the "Compensation Ban") as a severe burden on their right to free speech and equal protection of the law.  Compl. at ¶¶ 2, 39; Counts I (as -applied First Amendment), II (equal protection). Plaintiffs challenge the requirement for paid initiative petition circulators (and only paid initiative petition circulators) to register with Defendant Lee before they may circulate initiative petitions imposed by Fla. Stat. Title IX §100.371(3) and Fla. Admin. Code Rule 1S-2.009(6)(a) &

(a)(2) (hereinafter the "Registration Requirement") as a violation of Plaintiffs'
right to equal protection of the law.  Compl. at ¶¶4, 44; Count III.  Plaintiffs
challenge the data collection requirement imposed under the Registration
Requirement mandating that paid initiative petition circulators (and only paid
initiative petition circulators) provide public information to Defendant Lee
including their name, permanent address, temporary address and (amazingly) date
of birth before they may circulate initiative petitions imposed under Fla. Stat. Title
IX §100.371(4)(b) and Fla. Admin. Code Rule 1S-2.009(6)(a)(1) (hereinafter the
"Data Collection Requirement") as a severe burden on their right to free speech
and equal protection of the law.  Compl. at ¶5; Counts IV (as applied First
Amendment), V (equal protection).  Plaintiffs challenge the requirement that the
name and address of paid initiative petition circulators (and only paid initiative
petition circulators) be printed on the front, lower right corner of each petition page
made visible to petition signers and onlookers imposed under Fla. Stat. Title IX
§100.371(6) (2021) and Fla. Admin. Code Rule 1S-2.009(6)(a)(3) (hereinafter the
"Identification Requirement") as a severe burden on Plaintiffs' right to free speech
and equal protection of the law.  Compl. at ¶¶ 7, 49, 50-52; Counts VI (as applied
First Amendment), VII (equal protection). Plaintiffs Florida Right to Pray and
Citizens in Charge challenge the higher economic penalty imposed on sponsors of
initiative petitions when paid petition circulators fail to file signed petitions within

(and only on sponsors who hire paid petition circulators who fail to turn in petition forms within 30 days), imposed under Fla. Stat. Title IX § 100.371(7)(a)(2) and Fla. Admin. Code Rule 1S-2.009(2)(b) (hereinafter the "Penalty") as a severe burden on Plaintiffs' right to free speech and equal protection of the law. Compl. at ¶¶ 9, 10, 126, 127; Counts VIII (as applied First Amendment), IX (equal protection). Lastly, Plaintiffs challenge the Compensation Ban, the Penalty and the Registration, Data Collection, and Identification Requirements, in the aggregate, as a severe burden of Plaintiffs' rights guaranteed under the First and Fourteenth Amendments to the United States Constitution. Compl. at ¶11; Count X (as applied First Amendment).

Plaintiffs seek prospective equitable relief in the form of declaratory and injunctive relief against Defendant Lee who is in charge of accepting and policing requirements imposed on the circulation of initiative petitions and referring violations to Defendant Moody who is in charge of criminal prosecution of any violation of the challenged Compensation Ban, Penalty provisions and Registration, Data Collection, Identification Requirements (collectively the "Challenged Statutes"). Compl. at ¶¶ (a)-(v). Plaintiffs' requested relief will afford Plaintiffs complete relief from the Challenged Statutes.

Defendant's motion to dismiss must be denied because Plaintiffs have standing as they are suffering current injuries to their rights under the First and

4

Fourteenth Amendments to the United States Constitution as they are impaired,

today, from circulating initiative petitions free from the restrictions of the

challenged statutes which reduces the pool of available petition circulators,

increase the time it takes to collect signatures, makes Plaintiffs' petition drives

more expensive and less likely to success and reduces the total quantum of speech

in the circulation of Plaintiffs' initiative petitions.  Compl. at ¶¶ 2, 16, 17, 19, 21,

43, 69, 77, 78, 88, 89, 90, 91, 92, 94, 95, 96, 98, 107, 108, 109, 111, 112, 113, 114,

115, 116, 117, 118.  Plaintiffs' claims are ripe for adjudication as Plaintiff require

the requested relief to be able to secure ballot access for the 2024 general election

free form the challenged restrictions. Furthermore, Plaintiffs state clear,

unambiguous claims, far in excess of federal notice pleading requirements, which

have been held meritorious by other federal courts such that Plaintiffs claims easily

satisfy the plausibility threshold required to defeat Defendant's pending motion to

dismiss.

## II.   <u>MOTION TO DISMISS STANDARD</u>

As this Court is well aware, "[t]o survive a motion to dismiss a complaint

must contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The "plausibility standard"

requires a showing of "more than a sheer possibility" that the defendants are liable

for the claim. *Id*.  "Detailed factual allegations" are not required, but legal "labels and conclusions," unsupported by factual allegations, will not suffice.  *Twombly*, 550 U.S. at 555.

At the motion to dismiss stage of the case, the Court is required to accept all well-plead factual allegations as true and construe them, along with the reasonable inferences they create, in the light most favorable to the plaintiff.  *See Iqbal*, 556 U.S. at 679; *Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016); *Cinotto v. Delta Air Lines, Inc.*, 674 F.3d 1285, 1291 (11th Cir. 2012).  Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

## III.   <u>ARGUMENT</u>

A.   <u>This Court Has Jurisdiction</u>

   1.   <u>All Plaintiffs Have Standing</u>.

To establish standing under Article III of the U.S. Constitution, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Courts are required to assure themselves that at least one Plaintiff has standing in order to

sustain the Court's ongoing jurisdiction to adjudicate Plaintiffs' claims.  *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1272 (11th Cir. 206) (emphasizing that courts have an "independent obligation…to ensure a case or controversy exists as to each challenged provision in a case).

At the motion to dismiss stage, a complaint need only "clearly allege[] facts demonstrating each element" of standing.  *See Glynn Env't Coal, Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) (quoting *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019)).  General factual allegations are sufficient, so long as the complaint plausibly alleges a concrete injury.  *See id.*

Plaintiffs' pleading exceeds the minimum requirements of Article III standing.  The complaint establishes that Plaintiffs are directly impacted in their current ability to secure access to the Florida general election ballot for their proposed initiative petitions seeking to amend the Florida state constitution as a direct and proximate result of Defendants' enforcement of the Challenged Statutes. Plaintiff Florida Right to Pray is a registered political committee with the Secretary of State seeking to qualify a proposed Initiative Petition in Florida for the 2024 general election ballot to strictly limit the ability of Florida government officials to curtail religious gatherings. Compl at ⁋⁋ 14, 62, 63.  Plaintiff John Loudon is the chairman of Plaintiff Florida Right to Pray.  Compl. at ⁋⁋20, 64.  Plaintiffs Florida

Right to Pray and John Loudon are authorized to presently collect signatures to place their proposed constitutional amendment on the 2024 general election ballot. Plaintiff Citizens in Charge intends to sponsor an Initiative Petition in Florida for the 2024 general election to establish a statutory initiative process to permit citizens to adopt statutes through the ballot box without the need to constantly amend the Florida state constitution.  Compl. at ¶¶ 27, 106.  Plaintiffs are required to collect 891,589 valid signatures on petition pages to secure access to the 2024 general election ballot.  Compl. at ¶¶ 53, 56,

Plaintiffs are currently injured in their ability to freely circulate initiative petitions in Florida to qualify for the 2024 general election ballot by the Challenged Statutes which reduce the pool of available petition circulators; make their petition drives more expensive, more time consuming, less likely to succeed in securing ballot access and reduce the total quantum of speech available for Plaintiffs' petition drives. Compl. at ¶¶ 2, 16, 17, 19, 21, 43, 69, 77, 78, 88-92, 94-96, 98, 107-109, 111-118.  A large number of the best professional petition circulators, including Plaintiff Pool, refuse to work in those few jurisdictions which prohibit their compensation based on the number of valid signatures they collect – because they can earn more income in jurisdictions which do not impose such bans.  The Compensation Ban intentionally reduces the total compensation of professional petition circulators for the precise purpose of impairing the ability of

initiative sponsors to contract for the services of the best petition circulators who are uniquely able to collect large numbers of valid petition signatures in a much shorter period of time than novice volunteer circulators or other, less experienced or mediocre professional circulators.  This, in turn, increases the total cost of the petition drive because compensation based on the number of valid signatures collected is the most efficient means for compensating petition circulators and the only method to guarantee an efficient production of signatures for the purpose of advancing toward the only goal of securing ballot access.  And to be clear, access to the ballot is the only acceptable outcome to an initiative sponsor, getting close is meaningless.  Star Wars' Yoda's famous command "Do or Do Not - There is No Try" is particularly applicable to the decision an initiative sponsor must make to determine whether or not to pull the trigger to launch a petition drive. The decision to spend millions of dollars to seek ballot access can only be made when the sponsor reasonably believes that he has both the circulators and budget to secure the over 800,000 signatures to secure ballot access – getting close to ballot access is a meaningless and devastating result.

The Compensation Ban also introduces extreme uncertainty as to the total cost to collect the number of signatures required to secure ballot access (when you can compensate professional petition circulators based on the number of valid signatures collected, an initiative sponsor knows the exact cost of a petition drive

[number of signatures required x cost per valid signature = total cost of petition drive], prohibiting compensation based on signatures collected essentially requires compensation based on number of hours worked without any guarantee that those hours worked will generate the number of signatures required or at a rate that can be ascertained in advance for the purpose of designing an accurate budget). All of which advances the real goal of the Compensation Ban which is to make it less likely that sponsors will secure ballot access and protecting the Legislature's conceited view that they, and only they, should have control of the political agenda within the State of Florida.

Further, Plaintiffs Florida Right to Pray, John Loudon and Citizens in Charge are injured because Plaintiffs want to hire Morning in America, LLC (a trusted professional petition circulation firm) to manage their petition drives to secure ballot access for the 2024 general election. Compl. at ¶¶ 28, 77, 107. Morning in America, LLC has informed Plaintiffs Florida Right to Pray, John Loudon and Citizens in Charge that the Compensation Ban (as well as the Registration, Data Collection, and Identification Requirements) "make it financially impracticable" for Plaintiffs to seek ballot access until enforcement of the Challenged Statutes are either repealed or enforcement enjoined and declared unconstitutional. Compl. at ¶¶ 69. The ability of Plaintiffs Florida Right to Pray, John Loudon and Citizens in Charge to hire their preferred petition management

firm, Morning in America, LLC is prevented as a direct and proximate result of the

Challenged Statutes.

All of Plaintiffs' current aforementioned injuries resulting from the

Compensation Ban have been established as legitimate injuries by other courts in

their findings of fact and conclusions of law.  *See e.g.*, *On Our Terms '97 PAC v.*

*Secretary of State of Maine*, 101 F.Supp.2d 19, 20-25 (D. Maine 1999).  In *On Our*

*Terms '97*, the district court explained:

> I am nonetheless persuaded that the Statute [a ban on compensation
> based on the number of signatures collected] severely burdened the
> plaintiffs' attempts to mount the Pledge Drive in 1997.  U.S Term
> Limits and On Our Terms, like the plaintiffs in *Meyer*, had begun the
> process of collecting signatures when they made a judgment call,
> informed by personal experience with that process, that the state
> regulation in question posed a significant problem for their initiative
> campaign.   The *Meyer* plaintiffs judged that they would need the
> assistance of paid personnel to obtain the required number of signatures
> within the allotted time. *Meyer*, 486 U.S. 414, 417 (1988).  USTL and
> OOT judged that the ban on payment per signature would undermine
> estimates of collection costs and time frames, threatening the success
> of the entire Pledge Drive effort.  There was no need in either case for
> the plaintiffs to press their campaigns to completion to demonstrate the
> burdensome effect of the applicable state regulation.  During the Pledge
> Drive campaign OOT encountered difficulty recruiting and keeping
> circulators when offering pay on an hourly basis.  OOT and USTL had
> reason to believe, based on the personal experience of Jacob and
> Waters, that to the extent they were able to attract circulators to
> undertake this inherently stressful work, those workers would be less
> productive than if paid per signature…. For these reasons the Statute
> "limit[ed] the number of voices who [would] convey [plaintiffs']
> message[,]…limit[ed] the size of the audience they [could] reach" and
> made it "less likely that [plaintiffs would] garner the number of
> signatures necessary to place the matter on the ballot, thus limiting their

ability to make the matter the focus of statewide discussion." *Meyer*, 486 U.S. at 422-23.

*On Our Terms '97 PAC*, 101 F.Supp.2d at 26.  As explained by *On Our Term '97*, a plaintiff need not first take a petition to conclusion in order to state valid claims when in the experience of the proposed sponsor the restrictions will make it impossible to successfully conclude a petition drive.  Paul Jacob, president of Citizens in Charge, is the same person, who in *On Our Term '97* was considered by the court experienced enough to make the determination to wait until the challenged restrictions are adjudicated before launching a new petition drive.  The same applies for Citizens in Charge in the instant action.

Furthermore, Plaintiff Citizens in Charge is actively working to secure authorization to circulate their initiative petitions for the 2024 general election.  This lawsuit was simply timed first because Florida Right to Pray and John Loudon are further down the initiative petition road than Citizens in Charge and, hence, this litigation ensued before Plaintiff Citizens in Charge secure final authorization to launch their petition drive. In any event, only 1 Plaintiff is required to move this litigation forward, and Florida Right to Pray, John Loudon and Trenton Pool clearly satisfy all Article III standing requirements without the small factual wrinkle presented by Citizens in Charge.

Plaintiff Pool also has standing to maintain his claims as an out-of-state professional petition circulator who wants to circulate initiative petitions for

Plaintiffs Florida Right to Pray, John Loudon and Citizens in Charge, but is prohibited by the Challenged Statutes to receive the compensation of his choice. Plaintiff Pool is also required to first register with Defendant Lee before he can start circulating Plaintiffs' initiative petitions thereby increasing the amount of time he must spend in Florida and increasing his costs to circulate Plaintiffs' initiative petitions.  Pool is also required to provide Defendant Lee personal information to her for public dissemination including his name, address and date of birth to potential political opponents which increases the risk to his personal safety from political opponents in the circulation of initiative petitions in Florida.  Compl. at ¶¶ 29-36, 31-34, 109-110.

It is uncontested that all of Plaintiffs' injuries are a direct result of the Challenged Statutes and Defendants' enforcement of the Challenged Statutes.  It is also beyond legitimate dispute that Plaintiffs' injuries and will be completely remedied by the requested relief.  Accordingly, all Plaintiffs have standing to maintain their claims in the instant action.

2.   Plaintiffs' Claims Are Ripe for Adjudication.

The ripeness doctrine prevents courts, through premature adjudication, from entangling themselves in abstract disagreements.  *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 291 F.3d 1301, 1315 (11th Cir. 2000). Ripeness is not an issue when a court can determine that the claims are sufficiently

concrete to permit effective decision making by the court.  *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).

The instant action is clearly ripe for adjudication.  The Challenged Statutes have been signed into law and Defendants have expressed no decision that they would not fully enforce the Challenged Statutes against Plaintiffs.  Plaintiffs Florida Right to Pray and John Loudon are currently circulating their initiative petition, to dismal effect, using ineffective and unreliable volunteer circulators.  Plaintiffs are not able, as a direct and proximate result of the Challenged Statutes to hire the professional petition circulators of their choosing.  Plaintiff Citizens in Charge intends to circulate their initiative petition as soon as the Challenged Statutes are no longer in effect permitting for the free exercise of their right to launch their petition drive under a constitutional environment and under conditions allowing for the most economical petition drive possible within budgetary expectations to facilitate ballot access.  Plaintiff Pool is subject to the Challenge Statutes and prevented from receiving the compensation from Plaintiffs that he normally enjoys from the fruit of his expertise in collecting large numbers of valid signatures in the shortest period of time.

Accordingly, all of Plaintiffs' claims are ripe for adjudication.

B.    Defendants' Motion to Dismiss Must Be Denied

1.    Plaintiffs' Claims Are Clear, Unambiguous, Valid and Should Be
      Dismissed.

First, contrary to Defendant Moody's assertion, Plaintiffs' complaint is not a

"shot-gun" complaint.  While each claim incorporates all previous allegations,

each claim nevertheless includes within their discrete paragraphs all of the facts

and allegations necessary to state a clear claim. Each Count states a concise, self-

contained story, recounting allegations made prior in the complaint. Based on

Plaintiffs' research it seems state defendants roll out the "shot-gun" complaint

defense whenever a complaint provides extensive factual allegations and includes a

standard incorporation of all previous allegations (done for the purpose of some

added brevity) into the individuals counts no matter how well formed and concise

the counts are drafted.  This practice should be condemned by this Court as a waste

of everyone's time.

As a whole, Plaintiffs' complaint state unambiguous claims that the

Challenged Statutes individually, and in tandem, impair free speech rights

guaranteed to Plaintiffs under the First and Fourteenth Amendments by imposing

impediments to Plaintiffs' ability to freely circulate initiative petition in Florida

and/or the Equal Protection Clause of the Fourteenth Amendments as the

Challenged Statutes specifically target only the exercise of a fundamental

constitutional right based on the nature of the speaker's speech while exempting all

other similarly situated speakers from those restrictions.  Simple.  Clear.

Unambiguous.

The complaint further provides detailed factual allegations explaining why

these impediments injure Plaintiffs' ability to secure ballot access for their

proposed initiative petitions – factual allegation, which if proven at trial, entitle

Plaintiffs to their requested relief on the merits of their claims – as other plaintiffs

in other federal courts across the country have accomplished.  Accordingly,

Plaintiffs' claims are not just plausible, they are, in fact, valid claims which will be

established from the record Plaintiffs elicit in this case – a record Plaintiffs have

already begun to establish as evidenced through the Declarations filed in this

action in support of this memorandum and Plaintiffs' forthcoming motion for

preliminary injunction (ECF Docs. 18-67).

        a.        Plaintiffs' State Cognizable and Valid First Amendment
                Claims.

Plaintiffs claim that the Compensation Ban, Data Collection Requirement,

Identification Requirement and Penalty, both individually and in tandem, impair

rights guaranteed to Plaintiffs under the First and Fourteenth Amendments to the

United States Constitution. *See*, Count I (Compensation Ban), Count IV (Data

Collection Requirement), Count VI (Identification Requirement), Count VIII

(Penalty), Count X (Challenged Statutes in Tandem).  Each imposes a new

condition on Plaintiffs, initiative sponsors and professional petition circulators with

new restrictions on their right to otherwise freely circulate initiative petitions in

Florida.  Violation of these new restrictions carry financial and criminal penalties

enforced by Defendant Moody.  Accordingly, on their face, the Compensation Ban,

Data Collection Requirement, Identification Requirement and Penalty impair a

fundamental constitutional right.  The only litigable issue in this action is the

extent and severity of the restrictions and the state's level of interest in enforcing

the exact restrictions imposed sufficient to warrant the relief requested in this

action.

Plaintiffs have plead that each restriction impairs Plaintiffs' rights under the

First Amendment.  Compl. at ¶¶ 2, 5, 7, 9-10, 39, 49, 50-52, 126, 127.  Plaintiffs

have plead with specificity the exact injuries caused to them as a result of these

First Amendment impairments.  Compl at ¶¶ 9-10, 16-17, 19, 21, 31, 43, 69, 74-78,

88-92, 94-96, 98, 107, 108-118, 126-127.  Plaintiffs have also plead a present,

concrete interest in the relief requested in this action.  Compl. at ¶¶ 14-15, 28, 31-

34, 37-38, 54-56, 62-64, 102-106.  And, Plaintiffs have requested the full array of

prospective equitable relief necessary to receive complete relief from the offending

restrictions.  Compl. at ¶¶ (a)-(v).

The foregoing establishes that the First Amendment claims advanced by

Plaintiffs are sufficient to meet the plausibility threshold to defeat Defendants'

motion to dismiss.  However, Plaintiffs are not content to brief to mere plausibility

when the claims are, in fact, valid.

> (i)     Plaintiffs' First Amendment Challenges to the
>         Compensation Ban are Valid.

In 1988, the United States Supreme Court held in *Meyer v. Grant*, 486 U.S.

414 (1988), that a ban on paying petition circulators was unconstitutional. The

Court reasoned the circulation of a ballot access petition involves interactive

communication between the circulator and the potential signer which the Court

described as "core political speech" meriting the highest protections under the First

Amendment such that any restriction which decreased the pool of available

circulators was subject to struct scrutiny analysis.   The Court in *Meyer* explained:

> We fully agree with the Court of Appeals' conclusion that this case
> involves a limitation on political expression subject to exacting
> scrutiny.  The First Amendment provides that Congress "shall make no
> law…abridging the freedom of speech, or of the press; or the right of
> people to peaceably assemble, and to petition the Government for a
> redress of grievances."   The Fourteenth Amendment makes that
> prohibition applicable to the State….
>
> The circulation of an initiative petition of necessity involves both the
> expression of a desire for political change and a discussion of the merits
> of the proposed change.  Although a petition circulator may not have to
> persuade potential signatories that a particular proposal should prevail
> to capture their signatures, he or she will at least have to persuade them
> that the matter is one deserving of the public scrutiny and debate that
> would attend its consideration by the whole electorate.  This will in
> almost every case involve an explanation of the nature of the proposal
> any why its advocates support it.  Thus, the circulation of a petition
> involves the type of interactive communication concerning political
> change this is appropriately described as "core political speech."

The refusal to permit appellees to pay petition circulators restricts political expression in two ways. First, it limits the number of voices who will convey appellees' message and the hours they can speak and, therefore, limits the size of the audience they can reach. Second, it makes it less likely that appellees will garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion....

That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protections....That [the statute] leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.

*Meyer*, 486 U.S. at 420-24 (internal citations omitted).

Florida's Compensation Ban imposes a restriction which the best petition circulators in the nation refuse to submit, thereby reducing the pool of available petition circulators (in fact the best petition circulators) triggering strict scrutiny analysis for which the state does not have a valid purpose to enforce. In cases where other plaintiffs established a record showing similar per-signature compensation bans reduced the pool of available circulators, the bans have been held unconstitutional.

In *On Our Terms '97 PAC v. Secretary of State of Maine*, 101 F.Supp. 2d 19 (D. Me. 1999), the Court in *On Our Terms '97*, held that:

I am nonetheless persuaded that the Statute severely burdened the plaintiffs' attempts to mount the Pledge Drive....

During the Pledge Drive campaign OOT encountered difficulty recruiting and keeping circulators when offering to pay on an hourly basis. OOT and USTL had reason to believe, based on the personal experience of Jacob and Waters, that to the extent they were able to attract circulators to undertake this inherently stressful work, those workers would be less productive than if paid per signature. Finally, the Statute as worded left doubts in Michael's mind that he could ameliorate its effects by setting minimum standards or rewarding for productivity without subjecting himself to criminal prosecution.

For these reasons the Statute "limit[ed] the number of voices who [would] convey [plaintiffs'] message[,]…limit[ed] the size of the audience they [could] reach" and made it "less likely that [plaintiffs would] garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id*. at 422-23.

The statute, like the Colorado payment ban, did not completely stifle initiative and referendum activity in Maine, leaving open the possibility of conducting successful signature-gathering campaigns either via volunteers or employing "more burdensome" forms of paying professional circulators. *See id* at 424. That these avenues remained open does not alter the finding that the Statute heavily burdened protected speech.
…

In light of the foregoing, I conclude and declare that under controlling United States Supreme Court precedent the Statute as applied to USTL, OOT and others similarly situated violates the First Amendment. So ordered.

*On Our Terms '97* 101 F.Supp. 2d at 25-26.

While *Meyer* did not address the constitutionality of more narrow pay-per-signature bans, nothing in the Court's analysis suggests that any reduction in the pool of available circulators resulting from compensation restrictions is permissible. The analysis employed by the Supreme Court in *Meyer* that bans on

compensation which reduced the pool of available circulators triggered strict

scrutiny analysis was properly extended by the Maine district court to the pay-per-

signature ban at issue in *On Our Terms '97*.

Courts readily hold that election laws impose severe burdens, and are subject

to strict scrutiny where, as here, they make it less likely that the proponent will

gather the number of signatures required for the ballot (thereby preventing

proponents from making the initiative issue a matter of focus in a statewide

election), eliminate the persons who are best able to convey proponents' message,

limit the number of persons who will convey the proponents' message, reduce the

size of the audience proponents can reach, or otherwise increase the overall cost of

signature gathering. *Buckley*, 525 U.S. at 194-95; *Meyer*, 486 U.S. at 422-24;

*Campbell v. Buckley*, 203 F.3d 738 (10th Cir. 2000); *Indep. Inst. v. Buescher*, 718

F.Supp.2d 1257, 1269-71 (D. Colo. 2010).

Based on *Meyer*, the district court in *Limit v. Maleng*, 874 F.Supp.1138

(W.D. Wash. 1994), invalidated a Washington statute which prohibited payment of

petition circulators of initiative and referendum petitions on a per-signature basis.

The State of Washington maintained that its statute was constitutionally

permissible since, unlike the Colorado statute at issue in *Meyer*, Washington's

statute did not totally ban compensation for signature gatherers but rather merely

banned the per-signature payment of circulators and that its statute was thus a

narrowly focused, content-neutral regulation tailored to further the State's policy of protecting the integrity of the initiative process.  However, the court found that the State had failed to adduce "actual proof of fraud stemming specifically from the per-signature method of compensation," and thus the State had failed to sustain its burden to justify the legislation.  *Id*. at 1141.  Plaintiffs in this action would interject at this point, that no state has provided any evidence in any prior litigation that compensation based on the number of signatures collected increases petition fraud.  The *Limit* Court rejected the argument that the State of Washington needed only to show that the legislation was based on the legislators' perception that payment per signature encouraged fraud.  Instead, in reliance on *Meyer*, the court held, "Unless there is some proof of fraud or actual threat to citizens' confidence in government which could provide a compelling justification, the right of public discussion of issues may not be infringed by laws restricting expenditures on referenda and initiative campaigns."  *Id*. at 1141.

The United States Court of Appeals for the Sixth Circuit held Ohio's complete ban on per-signature compensation imposed a severe burden on core political speech and failed under strict scrutiny analysis – for the same reasons the courts in *On Our Terms* and *Limit* held per-signature compensation bans imposed severe restrictions on First Amendment speech and the same basis for strict

scrutiny analysis argued by Plaintiffs in this action.  *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008).  The Sixth Circuit explained that:

> Bans on paying circulators, whether outright or partial, can impact political expression in at least three related but distinct ways: (1) a ban can reduce the number and hours of voices which will convey the message; (2) It can limit the size of the audience of the petition; and (3) it can lower the likelihood that a measure will qualify for the statewide ballot.  A circulator plays a crucial role in the petition process because the circulator both has to express the petitioner's desire for change and has to discuss the merits of the proposed change.  Finally, although the availability of other payment methods might reduce the burden, the extent to which the more effective means are foreclosed is an important consideration.

*Citizens for Tax Reform*, 518 F.3d at 383.  While the Sixth Circuit focused on the explicit time-only compensation mandate of the challenged Ohio law, in the absence of the ability to pay based on the number of valid signatures collected, there is no other possible payment method other than a time-based compensation model.

And again, the Colorado district court found a ban limiting compensation based on the number of signatures collected to 20% of total compensation reduced the pool of available circulators and increased both inefficiency and the cost of the petition drive while having no effect on either signature validity rates or the incidences of petition fraud  and, therefore, held Colorado's partial ban on per-signature compensation unconstitutional under strict scrutiny analysis.  *See*,

*Independence Inst. v. Gessler*, 936 F.Supp.2d 1256, 1259-73, 1275-81 (D. Colo. 2013).

Most recently, Judge Moody of the United States District Court for the Eastern District of Arkansas denied a motion to dismiss plaintiffs' challenge to the newly enacted Arkansas ban on per-signature compensation for initiative and referendum petition circulators. *Liberty Initiative Fund v. Thurston*, 21-cv-460, ECF Doc. #26 (E.D. Ark., April 13, 2022).

Accordingly, Plaintiffs state a valid challenge to Florida's complete ban on per-signature compensation for initiative circulators.  As a result, Defendants' motion to dismiss Count I and X of Plaintiffs' complaint should be denied.

        (ii)    Plaintiffs' First Amendment Challenge to the Penalty States a Valid Claim.

Section 97.021 defines a "petition circulator" as: "an entity or individual who collects signatures for compensation for the purpose of qualifying a proposed constitutional amendment for ballot placement."    Section 100.371 (7)(a)(2) imposes a heightened $500 fine "for each petition form collected by a ***petition circulator*** (i.e. a professional petition circulator) which is not submitted to the supervisor of elections.  A fine in the amount of $1,000 for any petition form not submitted if the sponsor or petition circulator acted willfully."  Accordingly, the heightened $500 and $1,000 fines are only imposed on petitions collected by paid petition circulators – not volunteers.

24

The challenged Compensation Ban aside, the Penalty is a naked attack on the Supreme Court's ruling that the First Amendment guarantees the right of sponsors to hire professional petition circulators.  The challenged Penalty is a direct attack and places a chill on that constitutional right.  Any sponsor of an initiative petition in Florida, including Plaintiffs, exercising the right to hire professional petition circulators to collect signatures established by the Supreme Court in *Meyer v. Grant*, are now threatened by Florida with a unique economic penalty if one or more of their professional petition circulators fail to file petitions – a civil penalty not imposed on errant voluntary petition circulators or any circulator of a candidate petition in Florida.  Florida does not have the authority to target the exercise of rights under the First Amendment with heightened civil penalties.  Accordingly, Plaintiffs Count XIII states a valid claim.  However, if greater specificity is required in the pleadings on this Couny, Plaintiffs request leave to amend.

> (iii)   Plaintiffs' First Amendment Challenge to the Data
> Collection Requirement and Identification Requirements
> <u>State Valid Claims</u>.

The Supreme Court's decision in *Buckley v. American Constitutional Law Found.*, 525 U.S. 182 (1999) makes clear that requirements for initiative and referendum petition circulators to provide identifying information to the public during the circulation of petitions is a severe burden on the exercise of core

political speech protected under the First Amendment. *Buckley*, 525 U.S. at 197-201. *Buckley* held the evidence demonstrated that the requirement to wear an identification badge "demonstrated that compelling circulators to wear identification badges inhibits participation in the petitioning process." *Id*. at 197-98. The Court drew a clear line between the requirement to provide identification information made available to the public during the circulation of a petition versus information, such as on an affidavit executed after the petition drive is completed at the time of filing the petitions, providing the State with necessary information after the petition drive is over. Simply stated, few people bother to track down affidavit information on circulators whereas personal information on display during the circulation of a petition poses a greater threat to a circulator than providing personal information to state officials after their public exposure is completed. Florida's Data Collection Requirement and Identification Requirement is not a badge, but the impact is the same to the extent that personal information is made available to the public during the collection of signatures. Accordingly, Plaintiffs state a valid claim that the Data Collection Requirement and the Identification Requirement state valid claims under the First Amendments. Defendants' motion to dismiss Counts IV and VI should be denied.

        b.    Plaintiffs State Valid Claims Under the Equal Protection Clause <u>of the Fourteenth Amendment</u>.

All of the Challenged States impair rights guaranteed to Plaintiffs under the Equal Protection Clause of the Fourteenth Amendment.  They are invalid under the Equal Protection Clause without any further, or at most, limited factual development of the record.

The circulation of initiative and referendum petitions implicate exercise of a fundamental right of "core political speech" protected under the First and Fourteenth Amendments to the United States Constitution.  The Challenged Statutes are imposed only on those petition circulations who circulate initiative petitions for compensation.  None of the Challenged Statutes target volunteer initiative petition circulations or ANY petition circulators for candidate petitions (that is because elected officials do not want to hinder petition circulators that they want to be able to collect signatures free from any restriction which might put at risk their own ability to secure ballot access for their own candidacies).

Accordingly, the disparate treatment of similarly situated groups – paid circulators vs. volunteer circulators and circulators of candidate petitions in the exercise of a fundamental right state valid claims under the Equal Protection Clause of the Fourteenth Amendment to which strict scrutiny analysis is applied. *See Maher v. Roe*, 432 U.S. 464, 470 (1977).  On their face, the Challenged Statutes violate equal protection concerns.  Suspect classifications are not necessary to state a valid equal protection claim when a fundamental right is

implicated.  As was the case with a cognate provision challenged in Arkansas with respect to the ban on pay per-signature, Judge Moody of the United States District Court for the Eastern District of Arkansas recently denied a motion to dismiss plaintiffs' challenge to the newly enacted ballot access restrictions in Arkansas applied only to paid initiative petition circulators and not volunteer circulators or circulators of candidate petitions. *Liberty Initiative Fund v. Thurston*, 21-cv-460, ECF Doc. #26 (E.D. Ark., April 13, 2022).

Further, Defendants, to date, have made no effort to explain why any alleged state interest in support of the Challenged Statutes against paid initiative petition circulators advances a state interest whereas the same interest is not present for a volunteer initiative petition circulators or petition circulators for candidate petitions. The answer to the foregoing, Plaintiffs would suggest, is that state legislature hates the loss of their exclusive power to legislate to the People, and they fully understand that the use of paid, professional petition circulators is often the best mechanism for initiative proponents to secure ballot access for their ballot questions.  It is precisely because paid petition circulators are so efficient and so successful in permitting the citizens of Florida to circumvent an unresponsive state government that Florida seeks to impose all manner of additional restrictions on paid professional petition circulations, and why they do not impose the same restrictions on often inept, and certainly inefficient, volunteer petition circulators

who do not threaten the legislature's otherwise exclusive legislative power to legislate.

In any event, Plaintiffs clearly state valid claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution with respect to enforcement of all of the Challenged Statutes against Plaintiffs. Accordingly, Plaintiffs' state valid claims as to Counts II, III, V, VII and IX.

    2.    Defendants' Motion to Dismiss Must Be Denied Because the United States Supreme Court Has Established that Adjudication of Ballot Access Restrictions of the Type Challenged in this Action Require a Factual Record Not Required at the Pleading Stage Under Federal <u>Notice Pleading Requirements</u>.

Ballot access restrictions are not amenable to dismissal under Rule 12 of the Federal Rules of Civil Procedure because adjudication of ballot access restrictions require the development of a factual record which is not required to be made part of the pleadings under federal notice pleading standards. By way of example, no prior federal challenge to a cognate ban on compensation based on the number of signatures collected has ever been successfully dismissed on a Rule 12 motion to dismiss. After development of factual records many such claims have succeeded on the merits. The Eleventh Circuit acknowledged as must in *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299 (11th Cir. 2021) ("GBM") explaining that analysis of an equal protection claim on a motion to dismiss involved many factors that "require a fact intensive examination of the record" and

that such a claims do not lend themselves to dismissal in the pleading stages where the record is not fully developed. *GBM*, 992 F.3d at 1322 n.33.

The United States Supreme Court established that courts must evaluate challenges to ballot access laws under the First and Fourteenth Amendments using the balancing framework set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) commonly known as the *Anderson-Burdick* analysis.

Under the balancing test of the *Anderson-Burdick* analysis, ballot access restrictions which impose severe burdens to First Amendment rights trigger strict scrutiny analysis and the restriction may only be upheld if the restriction is narrowly tailored to advance a compelling governmental interest.  Conversely, ballot access restrictions which do not impose severe burdens may only be upheld if the burden imposed by the ballot access restriction on protected First Amendment speech is less than the need for the actual state interest protected by the restriction.  Under this flexible standard:

> "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights'"

*Meyer v. Grant* 486 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789. Thus, "regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest," while "[l]esser burdens…trigger less exacting review, and a State's 'important regulatory interests' will *usually be enough* (but not always, as may be seen later in this case) to justify 'reasonable, nondiscriminatory restrictions,'" *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. 434).

This fact intensive analysis militates against dismissal of ballot access claims at the Rule 12 stage. Plaintiffs' counsel is not aware of any successful dismissal of a ballot access restriction at the pleading stage.

## IV.   <u>CONCLUSION</u>

For all the foregoing stated reasons, Defendant Moody's motion to dismiss should be denied. To the extent this Court does not dismiss Defendant Moody's motion to dismiss in full, Plaintiffs respectfully request leave to amend.

Respectfully submitted,

Dated: May 9, 2022                         /s/ Joel Lawrence Frank
                                                          Joel Lawrence Frank
                                                          Lamb McErlance PC
                                                          24 East Market Street
                                                          P.O. Box 656
                                                          West Chester, PA  19381
                                                          Phone:  610-701-4409
                                                          Fax:  610-692-087
                                                          jfrank@lambmcerlane.com

/s/ Paul Anthony Rossi_____
Paul A. Rossi
Admission *Pro Hac Vice*
IMPG Advocates
316 Hill Street, Suite 1020
Mountville, PA  17554
Phone: 717.961.8978
Paul-Rossi@comcast.net

## **CERTIFICATE OF SERVICE**

Plaintiffs, by and through their undersigned legal counsel, hereby certify that the foregoing document was electronically filed on this date with the Clerk of the Court and that opposing counsel was automatically served a true and correct copy of the foregoing via the Court's ECF system.

Dated: May 9, 2022                    /s/ Joel Lawrence Frank_____
                                      Joel Lawrence Frank

## **CERTIFICATION**

Plaintiffs, by and through their undersigned legal counsel, hereby certify that the body of the foregoing memorandum of law in opposition to Defendants' motion to dismiss complies with 8,000 word limit imposed under the Local Rules. Using the word count function of Microsoft Word, the body of the foregoing document contains only 7,259 words.

Dated: May 9, 2022                    /s/ Joel Lawrence Frank_____
                                                Joel Lawrence Frank